PRISONER'S CIVIL RIGHTS COMPLAINT (Rev. 07/2021)

**FILED**

November 10, 2021
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____  NM

DEPUTY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE _____ DISTRICT OF TEXAS
_____ DIVISION

John G. Centeno Jr.
Plaintiff's Name and ID Number

Bexar County Detention Center
Place of Confinement

CASE NO. **5:21-cv-01117-JKP**
(Clerk will assign the number)

v.

San Antonio Police Dpt.
Defendant's Name and Address

Bexar County Detention Center 200. N. Comal st.
Defendant's Name and Address

Officer Aguilar, S.carillo, & Officer Ortiz Grievance Supervisor,
Defendant's Name and Address              Sgt DeLosantos, M. Alvarez, officer McIntosh
( DO NOT USE "ET AL.")

---

### INSTRUCTIONS - READ CAREFULLY

**NOTICE:**

**Your complaint is subject to dismissal unless it conforms to these instructions and this form.**

1.   To start an action you must file an original and one copy of your complaint with the court.  You should keep a copy of the complaint for your own records.

2.   Your complaint must be legibly handwritten, in ink, or typewritten.  You, the plaintiff, must sign and declare under penalty of perjury that the facts are correct.  If you need additional space, **DO NOT USE THE REVERSE SIDE OR BACK SIDE OF ANY PAGE.**  ATTACH AN ADDITIONAL BLANK PAGE AND WRITE ON IT.

3.   You must file a separate complaint for each claim you have unless the various claims are all related to the same incident or issue or are all against the same defendant, Rule 18, Federal Rules of Civil Procedure.  Make a short and plain statement of your claim, Rule 8, Federal Rules of Civil Procedure.

4.   When these forms are completed, mail the original and one copy to the clerk of the United States district court for the appropriate district of Texas in the division where one or more named defendants are located, or where the incident giving rise to your claim for relief occurred.  If you are confined in the Texas Department of Criminal Justice, Correctional Institutions Division (TDCJ-CID),  the list labeled as "VENUE LIST" is posted in your unit law library. It is a list of the Texas prison units indicating the appropriate district court, the division and an address list of the divisional clerks.

**FILING FEE AND *IN FORMA PAUPERIS* (IFP)**

1.  In order for your complaint to be filed, it must be accompanied by the statutory filing fee of $350.00 plus an administrative fee of $52.00 for a total fee of **$402.00**.

2.  If you do not have the necessary funds to pay the fee in full at this time, you may request permission to proceed *in forma pauperis*. In this event you must complete the application to proceed *in forma pauperis*, setting forth information to establish your inability to prepay the fees and costs or give security therefor. You must also include a current six-month history of your inmate trust account. If you are an inmate in TDCJ-CID, you can acquire the application to proceed *in forma pauperis* and the certificate of inmate trust account, also known as *in forma pauperis* data sheet, from the law library at your prison unit.

3.  The Prison Litigation Reform Act of 1995 (PLRA) provides "... if a prisoner brings a civil action or files an appeal *in forma pauperis*, the prisoner shall be required to pay the full amount of a filing fee." *See* 28 U.S.C. § 1915. Thus, the court is required to assess and, when funds exist, collect, the entire filing fee or an initial partial filing fee and monthly installments until the entire amount of the filing fee has been paid by the prisoner. If you submit the application to proceed *in forma pauperis*, the court will apply 28 U.S.C. § 1915 and, if appropriate, assess and collect the entire filing fee or an initial partial filing fee, then monthly installments from your inmate trust account, until the entire $350.00 statutory filing fee has been paid. (The $52.00 administrative fee does not apply to cases proceeding *in forma pauperis*.)

4.  If you intend to seek *in forma pauperis* status, do not send your complaint without an application to proceed *in forma pauperis* and the certificate of inmate trust account. Complete all essential paperwork before submitting it to the court.

**CHANGE OF ADDRESS**

It is your responsibility to inform the court of any change of address and its effective date. Such notice should be marked **"NOTICE TO THE COURT OF CHANGE OF ADDRESS"** and shall not include any motion for any other relief. Failure to file a NOTICE TO THE COURT OF CHANGE OF ADDRESS may result in the dismissal of your complaint pursuant to Rule 41(b), Federal Rules of Civil Procedure.

I.  **PREVIOUS LAWSUITS:**

   A.  Have you filed *any* other lawsuit in state or federal court relating to your imprisonment? ✓YES___NO

   B.  If your answer to "A" is "yes," describe each lawsuit in the space below. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper, giving the same information.)

   1.  Approximate date of filing lawsuit: Pending
   2.  Parties to previous lawsuit:
       Plaintiff(s) John G. Centeno Jr.
       Defendant(s) Grievance Supervisor Sgt. Delosantos, arresting officer Aguilar & Data.
   3.  Court: (If federal, name the district; if state, name the county.) Bexar
   4.  Cause number: NM631179, NMS32040, 609801 3 Illegal arrests, wasn't aware it was Illegal till last arrest.
   5.  Name of judge to whom case was assigned: Jefferson Moore
   6.  Disposition: (Was the case dismissed, appealed, still pending?) 2 were dismissed 1 is pending
   7.  Approximate date of disposition: pending

II.    PLACE OF PRESENT CONFINEMENT: _Bexar County Detention Center_

III.    EXHAUSTION OF GRIEVANCE PROCEDURES:

Have you exhausted all steps of the institutional grievance procedure?    ✓ YES ___ NO

Attach a copy of your final step of the grievance procedure with the response supplied by the institution.

IV.    PARTIES TO THIS SUIT:

they Denied me the Responses & the final Steps, they said they dont give responses on paper only on Kiosk, & they Denied an Inmate handbook with final Steps that being filing an appeal.

A. Name and address of plaintiff: _____

_John G. Centeno Jr._    _2906 Anza St._

B. Full name of each defendant, his official position, his place of employment, and his full <u>mailing</u> address.

Defendant #1: _Officer Aguilar, S.A.P.D. (San Antonio Police Dept.)_

Briefly describe the act(s) or omission(s) of this defendant which you claimed harmed you.
_Illegal Arrest (A civil Rights Violation according to_ Wong Sun Vs. State, 83 S. Ct. 407 ~~Terry Vs Iowa 3888 108 989~~

Defendant #2: _Officer Ortiz_  _San Antonio Police Dept._

All Proof In Response from kiosk

Briefly describe the act(s) or omission(s) of this defendant which you claimed harmed you.
_Illegal arrest In May of 2019, 6A civil Rights Violation according to_ Wong Sun Vs. State 83 S. Ct. 407

Defendant #3: _Officer in Cause # NMS 32040 (Bexar County Detention Center Refused to Disclose the name of him) officer Ferguson - Stole my D.L. - Never put in my property)_

Briefly describe the act(s) or omission(s) of this defendant which you claimed harmed you.
_Illegal Arrest 6 civil Rights Violation according to_ (Wong Sun Vs. State 83 S. Ct. 407)

Defendant #4: _Grievance Supervisor Sgt. Delosantos (Bexar County Detention Center)_
_(Civil Rights Violation, A criminal Act, Unjust Denial or Restriction of Inmate privileges, Prohibited act by Staff)_

Briefly describe the act(s) or omission(s) of this defendant which you claimed harmed you.
_Violation Of Right to do Process of Law, Civil Rights Violation, Refusing to Investigate grievance, Mail Blocking (Proof on kiosk) Unjust Denial or Restriction of Inmate Privileges, Prohibited act by Staff, Harrasment, Denying_

Defendant #5: _Grievance Responder M. Alvarez & officer McIntosh_   Grievance Responses to be printed out.

Briefly describe the act(s) or omission(s) of this defendant which you claimed harmed you.
_Denying Grievances & Grievance Responses to be printed out for my records or for processing this form & Attaching Responses of Grievance Issues. (Conversation of Grievance on Kiosk through a missing System, Falsification of Grievance Procedures In Responses on kiosk, Refusal of Entitlements of Inmate Handbook & Procedures of Grievance & filing an appeal, Refusing Indigence_

V.    STATEMENT OF CLAIM:

State here in a short and plain statement the facts of your case, that is, what happened, where did it happen, when did it happen, and who was involved.  Describe how <u>each</u> defendant is involved.  <u>You need not give any legal arguments or cite any cases or statutes.</u>  If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph.  Attach extra pages if necessary, but remember the complaint must be stated briefly and concisely.  IF YOU VIOLATE THIS RULE, THE COURT MAY STRIKE YOUR COMPLAINT.

1.) A Civil Rights Violation (Illegal Arrest Denying Right to due process of law - an inmate privileges. A criminal Act by Staff (mail blocking, Harrasment) Unjust Denial and Restriction of Inmate privileges & Entitlements such as Inmate Handbook, Religious studying Book, Responses to grievances printed out, Falsification of Grievance procedure, Illegal holding, refusal of Motions & write, Violating grievance time-table rules, Denying Indigence, Refusing to Investigate grievance stating an Illegal arrest is not handled by this Department, telling me to call SAPD myself, but I cant because Im Illegally arrested. I do not know how to Estimate all this and would like a qualified Counsel to Estimate this. (Emotional stress, Depression) missing out on holidays w/ my kids, they refused me a writ of 23 after the 1st Illegal arrest, when I was handed out I was threatened by police to keep Quiet or they would harm me (have even beaten by inmate in Jail) Denyed My requests from Edge Exchange of my msg.

VI.    RELIEF: Asking for Parenting plan Classes & B.I.P.P. Domestic Violence Classes,

State briefly exactly what you want the court to do for you.   Make no legal arguments.  Cite no cases or statutes.

Released (Illegal Arrest) The bonds money back from 2 cases I was Illegally arrested on, and to be Compensated for the Emotional Stress/Depression & Suffering & Harrasment, and for time I was In Jail Illegally.

VII.    GENERAL BACKGROUND INFORMATION:

A.  State, in complete form, all names you have ever used or been known by including any and all aliases.

Jay/Jay, John G. Centeno Jr.

B.  List all TDCJ-CID <u>identification</u> numbers you have ever been assigned and all other state or federal prison or FBI numbers ever assigned to you.

8 96340ND9 - FBI, 1114347 - SID, 43207885 - D.L.

VIII.    SANCTIONS:

A.  Have you been sanctioned by any court as a result of any lawsuit you have filed?  ____YES  ✓ NO

B.  If your answer is "yes," give the following  information for every lawsuit in which sanctions  were imposed. (If more than one, use another piece of paper and answer the same questions.)

    1.  Court that imposed sanctions (if federal, give the district and division):_____

    2.  Case number:_____

    3.  Approximate date sanctions were imposed:_____

    4.  Have the sanctions been lifted or otherwise satisfied?                    ____YES ____NO

C. Has any court ever warned or notified you that sanctions could be imposed?          ____YES____NO

D. If your answer is "yes," give the following information for every lawsuit in which a warning was issued. (If more than one, use another piece of paper and answer the same questions.)

   1.  Court that issued warning (if federal, give the district and division): _____

   2.  Case number: _____

   3.  Approximate date warning was issued: _____

Executed on: _____
        DATE

                                   *John G. Centeno Jr.*

                                    (Signature of Plaintiff)

## PLAINTIFF'S DECLARATIONS

   1.  I declare under penalty of perjury all facts presented in this complaint and attachments thereto are true and correct.

   2.  I understand, if I am released or transferred, it is my responsibility to keep the court informed of my current mailing address and failure to do so may result in the dismissal of this lawsuit.

   3.  I understand I must exhaust all available administrative remedies prior to filing this lawsuit.

   4.  I understand I am prohibited from bringing an *in forma pauperis* lawsuit if I have brought three or more civil actions or appeals (from a judgment in a civil action) in a court of the United States while incarcerated or detained in any facility, which lawsuits were dismissed on the ground they were frivolous, malicious, or failed to state a claim upon which relief may be granted, unless I am under imminent danger of serious physical injury.

   5.  I understand even if I am allowed to proceed without prepayment of costs, I am responsible for the entire filing fee and costs assessed by the court, which shall be deducted in accordance with the law from my inmate trust account by my custodian until the filing fee is paid.

Signed this _____ day of *November* _____, 20 *21* _____.
                (Day)                (month)          (year)

                                    *John G. Centeno Jr.*

                                    (Signature of Plaintiff)

**WARNING: Plaintiff is advised any false or deliberately misleading information provided in response to the above questions may result in the imposition of sanctions. The sanctions the court may impose include, but are not limited to, monetary sanctions and the dismissal of this action with prejudice.**

**The Edge Exchange**

| Resident:<br>JOHN CENTENO<br>(1114347) | Location:<br>2D38 | Subject:<br>REQUESTING<br>WRITS AND<br>MOTIONS AND A<br>POST | Topic:<br>Law Library |
|---|---|---|---|
| Assigned: | Flag:<br>Day 1 | Ref #:<br>12777871 | Status:<br>Read |

**JOHN CENTENO** (1114347)  -  10/6/2021 9:59:45 AM (CT)

"MOTION TO DISMISS/INSUFFECIENT EVIDENCE", "POST CONVICTION TO
PURSUANT ARTICLE 1107 OF THE T.X. C.C.P." "WRIT OF HABEUS CORPUS TITLE 42-
43 SEC.1983 FEDERAL FILING" WRIT OF HABEAUS CORPUS EXCESSIVE BAIL "
WRIT OF HABEAUS CORPUS RELEASE BECAUSE OF DELAY 4-5 PAPERS

✓ #17
✓ #10
✓ 1983 info attached

5 items per week

5 items per week

excersive 5 per week

KD



#1 District Attorney

#2 Criminal Section

101 W. Nueva
4th floor,
78205

Lawsuit  Balterghts Suth
University  ShRidge Suth
SAPD Suit

Thanks
Castle Hills

5/28/21
Law library
Writ of 83

Ortiz = Blackmailed =

Illegal Arrests (Federal Filing Title 42 Sec 1983 Writ of Habeas Corpus)
1.) Wong Sun Vs. State, 83 S. Ct. 407.
2.) Terry Vs. Ohio, 88 S. Ct. 1868.
3.) Knowles Vs. Iowa 525 U.S. 999

5 officers. 3 causes. 2 Family Violence Cont. 1. family Violence
(Marriage) Alexis B. Gulley/John G. Centeno Sr. ← Father & Girlfriend
2. Family Violence/Marriage (Officer Ortiz) (May, 2019)
3. Continuous Family/Violence (Officer Aguilar)
4. Continuous Violence/Family (Officer S. Casilla A. Aguilar Palendo)
step III on Writ of Habeas Corpus title 42, Sec. 1983 (Federal Filing) 1906
Grievance Response Requests (Exhaustion Procedures) Final steps filing an appeal
    └ Requirement

Grievance Denier — Harassment. Civil rights Violation/Illegal A... tr/e.
Violation of rights to due process of law (Denial of grievance of writ
grievance response). +(Denial of Handbook w/grievance procedures)
Note: grievances are done on The kiosk through "Edge Services" at
Https://edgeexchange.heefe.cloud, so to obtain copy of grievance
response as previous required in the writ of Habeas Corpus Sec. 83)
the BCDC would have to print out those grievances to provide
them to us process of law but I was denied the response
even though its required. Also it says we should get a copy
for our records on The kiosk book. they denied them and a
handbook, also other responses from "Edge Services" that could
Influence the issue of Credibility for me, and requests
I made that I'm suppose to be given without asking. These
requests I was going to use in court as my exculpatory
evidence.    EDGE SERVICE Download SCORE book/C
Human Enhancement program    heefe.

*The B*

P. Reynosa

Off. McIntosh   grievance Responder

Off. Officer Ortiz - (Grievance issue) (Illegally Arrested by) Heights

Off. Aguilar - Illegally Arrested by

Sgt. Delasantos - Grievance Supervisor

Off. M. Alvarez - Grievance Responder

Sir Mr. J. Figuroa - Law Library Supervisor

Shield T. C. Henduche (Shift

Cali H. de la Montanya

2010
• Halloween West • East
Barcelo

• Pin Oak
• Rodriguez
• South
• East
• FBI — FBI — North
• Balcones

• Chevron
• Graham Central Station
• Amelia
• Barcelor

• Off. J. Ferguson counter

• Admissible Evidence (Fruits of a poisonous tree) "Invential"
Jail Programs rights Violation After Illegal acced Denials -
Parenting Class or Bequests Pointed out - ® Commission Venice + Supervision

• Filling Claim of Triple AAA of Mr. Brenda. Contacting
family Carmen, Bob, Dan, or Mr. Brenda Mother by
Wurzbach after I get out. I'm on Mr. B's Life Insurance
found out She dee 2 years ago early this year Have
Not had a phone or access to one to Claim the
Life Insurance Money.

• Race
• Religion
• Sex

D.A.
Being Criminals
Trying to Steal from

1.) Civil Rights Violation Appearance    Me hiring Criminals.
2.) A Criminal Act
3.) Unjust Denial or Restriction of Inmate privileges
4.) Prohibited act by facility.

Grievance Messages & Responses

"Greivance" Conversations on EDGE SERVICES. Https://Edgeexchange.htrffecloud/Fusion

Dates of Conversations on greivance Topic:

10/4/21 - Denial of Handbook w/ grievance procedures & procedures of "Filing Appeal"

10/7/21 - Denial for false statements/ Denial of greivance Response for Records

10/11/21 - Greivance Issue (Conversation Started on Edge Exchange Service System)

10/12/21

10/13/21 - Delayed responses till Next day everyday About greivance w/ Responses In

(waited for Responce till I messaged again) Everyday in Jail is a civil Rights Violation

10/18/21 ⟵ Response ⟶ 10/20/21

10/26/21 - Started asking for an appeal in Conversation about greivance Issue

10/27/21

10/29/21

10/30/21          After I'd reply, he waited a day

10/31/21          to reply back to my Msg. so

10/1/21           the Conversation of Messages took

10/2/21           days.

Response Time Explanation on Greivance Issue

Response Time Explanation on Grievance Issue was so days to say by day

(Employer)    Grievance Resp. -    • Delossantos)
                                   • N. Alvarez - Pictures
Harassment - Defendants than m outside of Jail, Harassing me in Jail    • McIntosh ) responses
Violation of Right to Due process of law
Pictural of Grievance Copys + Copies of responses for Processing Report

Grievance forms - (Mail blocking, Criminal Conduct, Civil rights Violator, Denial of Inmate
                                                                    Privelegs for more than 5
1.) 30th of October Sent.                                              Jays
• Reexamine Trial - 631179 - Cause
- Motion to Discover Criminal Record of Witiness 631179 - Cause
- Motion to Dismiss Insufficient Evidence = 631179 - Cause
- 5.15 pm
          (Burwell, Ramirez)
2.) Writ of Habeaus Corpus, Title 42, Sec. 1983  631179 - Cause   28th, October (2021)
• Civil Rights Violation (Illegal arrest, process of law, Denial of Inmate
• Illegal arrest (Suppress Evidence) 631179 - Cause  Criminal Conduct, , Privileges)
• Appointment of Investigator  631179 - Cause        Tom boy Jihi.
                  (Steele, Welch, Villareal)  Villareal  11.05 pm
3.) Nov. 1st
• Reveal agreement w/ witiness  Carlos Lopez / Dylon George / James Ishimoto
                                           S32040 - Cause
• Ralph Jaynes - Stimulis Checks Info
Sec. 22       Illegal Arrest Cause   (Cardena, Nutt)
            1.) 607801  Ortiz   - Dylon George
Fig. 130    NM2.) S32040        Carlos Pena
            NM3.) 631178  Aguilar, S. Carillo, Transport - Pokedo
H.      4.) Evidence that Helps my Case ? Requested Copies of Edge Exchange (Delayed)  Mrar Sign-Up
Limitation • 6/13/19 - Domestic Violence / BIPP Classes (7B 41302)  (Denied Copy of Mrg)
of Grievance • 5/28/19 - Request, Writ of Habeaus Corpus Title 42, Sec. 1983 again (Ortiz)
Procedure  • 10/3/21 - Domestic Violence / BIPP Classes (7B 41302) Request Copy of Mrg Sign Up
           • 9/30/21 - Parenting Plus Classes  Request Copy of Message  FROM EDGE EXCHANGE SERVICES
C.         • 9/28/21 - Requested GED Classes  Jail Programs P-Reynosa  1 Record C
grounds of   These may be addressed to approporate section-6
Initiation   using the Inmate request for Information form
of Grievance (Section 6 of the Inmate Handbook.)

whether carrier or shipper, who shall, knowingly, offer, grant, or give, or solicit, accept, or receive any such rebates, concession, or discrimination shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not less than $1,000 nor more than $20,000: Provided, That any person, or any officer or director of any corporation subject to the provisions of sections 41, 42, or 43 of this title, or of chapter 1 of this title, or any receiver, trustee, lessee, agent, or person acting for or employed by any such corporation, who shall be convicted as aforesaid, shall, in addition to the fine herein provided for, be liable to imprisonment in the penitentiary for a term of not exceeding two years, or both such fine and imprisonment, in the discretion of the court. * * *'

2    32 Stat. 848; 36 Stat. 1167; 49 U.S.C. s 43, 49 U.S.C.A. s 43: 'Whenever the Interstate Commerce Commission shall have reasonable ground for belief that any common carrier is engaged in the carriage of passengers or freight traffic between given points at less than the published rates on file, or is committing any discriminations forbidden by law, a petition may be presented alleging such facts to the district court of the United States sitting in equity having jurisdiction; and when the act complained of is alleged to have been committed or as being committed in part in more than one judicial district or State, it may be dealt with, inquired of, tried, and determined in either such judicial district or State, whereupon it shall be the duty of the court summarily to inquire into the circumstances, upon such notice and in such manner as the court shall direct and without the formal pleadings and proceedings applicable to ordinary suits in equity, and to make such other persons or corporations parties thereto as the court may deem necessary, and upon being satisfied of the truth of the allegations of said petition said court shall enforce an observance of the published tariffs or direct and require a discontinuance of such discrimination by proper orders, writs, and process, which said orders, writs, and process may be enforceable as well against the parties interested in the traffic as against the carrier, subject to the right of appeal as now provided by law. It shall be the duty of the several district attorneys of the United States, whenever the Attorney General shall direct, either of his own motion or upon the request of the Interstate Commerce Commission, to institute and prosecute such proceedings, and the proceedings provided for by sections 41, 42, or 43 of this title shall not preclude the bringing of suit for the recovery of damages by any party injured, or any other action provided by chapter 1 of this title. * * * Provided, That the provisions of sections 44 and 45 of this title shall apply to any case prosecuted under the direction of the Attorney General in the name of the Interstate Commerce Commission.'

3    Cf. United States v. Chicago North Shore R. Co., 288 U.S. 1, 53 S.Ct. 245, 77 L.Ed. 583, an appeal from a one-judge court from decree on a petition under section 12(1) of the Interstate Commerce Act as amended, 49 U.S.C. s 12(1), 49 U.S.C.A. s 12(1); Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 446, 60 S.Ct. 618, 620, 84 L.Ed. 852.

**\*455** The facts set forth in the findings and opinion of the District Court, 32 F.Supp. 917, together with the supporting record references specified by the district judge, give a clear statement of the origin and development of the Kansas City, Kansas, project:

Appellants DeOreo and Fean, before 1937, had promoted various metropolitan terminals with wholesale produce market and rail facilities. In December, 1936, they suggested to Union Pacific the feasibility of such a terminal to be served by its line at Greater Kansas City, and a plan was soon formulated for the construction of facilities on the Public Levee, property of Kansas City, Kansas; Union Pacific's aim was to increase its traffic and revenues from perishable food products. The plan contemplated that ownership of the terminal be vested in the City, which would be eligible for a PWA grant from the United States to cover part of the construction costs. A further consideration was that a city-owned market would be tax free, and thus able to offer dealers the inducement of especially low rentals. Union Pacific presented engineering and cost estimates to officials of the City of Kansas City, Kansas, who became interested in the project and determined that plans should go forward. Thereafter, Union Pacific and the City participated jointly in the promotion and financing of the terminal, and the court below found after a careful review of the evidence that Union Pacific took 'a leading and dominant part.' Union Pacific suggested the plan that financing be accomplished by a PWA grant and by revenue bonds of the City, secured only by revenue from the terminal and other levee **\*\*1069** property. Union Pacific suggested that the City make DeOreo and Fean exclusive leasing agents of the terminal for a period of ten years; when this contract was disapproved by PWA officials, the two promoters were persuaded to consent to its cancellation, and Union Pacific later caused substantial **\*456** payments to be made to them by its subsidiary, the Kansas City Industrial Land Company. The City's first application for a PWA grant, which it prepared with Union Pacific's assistance, was denied, but a later application for $1,710,000 won approval in October, 1938. This supplied 45% of the cost of structures the City was to build; the remaining 55% was to be obtained by selling revenue bonds to investment bankers. Union Pacific helped the City secure state legislation authorizing the bonds; the bankers, however, declined to purchase them when Union Pacific refused to guarantee income sufficient to meet fixed charges. Union Pacific then decided to buy the bonds for itself,

4589    John or Centeno dr.   07/16/98

S. Ct. = South Connecticut or State Constitution

L. Ed. = Legislative Education

U.S.C. = United States Constitution

KAN = Kansas

I. Supp = Financial Support

Ex. = Executive of Ex. or Ex. Rel.

Resolution 1175 - Resolution 1789

P. = Pacific or Parker = 920

V. = Versus

R. = Realator

CORP. = Corporation

Co. = Company

U.S. Constitution California
State or Statue

L. Litigation

Sec = Section

S. =

Cf =

Union Pacific

Elkins Act
Public Law Review
DWI Grant - Review Basketball

Interstate Commerce and
Sec 91 Al...

Chapter 1 of the title

PLEA

✗ 1068
✗ 455          ✗ 1076
✗ 456
✗ 1090          ✗ 450
✗ 458
✗ 459
✗ 471 ✗ 472

61 S.Ct. 1064, 85 L.Ed. 1453

paying $3,000,000 plus accrued interest; $1,033,000 of this was used to retire outstanding revenue bonds, and the remainder made available for construction of the terminal. The bonds, which were held valid in State ex rel. Beck v. Kansas City, 149 Kan. 252, 86 P.2d 476, are secured solely by the revenues accruing from the terminal and other property on the Public Levee; they constitute no claim against the City's general revenues, and the district court found that they 'were and are speculative and were not then salable in the ordinary course of the commercial investment business.'

Union Pacific also caused its officers, employees and agents, and those of its subsidiary, the Kansas City Industrial Land Company, and its affiliate, the Pacific Fruit Express Company, to render various services related to the promotional, leasing and financing activities; it advanced money for financing preliminary expenses; and together with the City it supervised the actual construction. The terminal as completed consists of railroad facilities, owned by Union Pacific, for which it spent $603,000; and the City's wholesale produce market, with a cold storage plant, produce dealers' buildings, a farmers' market, and some terminal trackage, all constructed with *457 funds derived from the PWA grant and the revenue bonds sold to Union Pacific.[4] The Food Terminal is a unitary enterprise, with the market and the railroad facilities integral parts of a unified whole. Union Pacific has the only tracks reaching the terminal, except that the Missouri Pacific jointly serves the cold-storage plant.

4    The City spent an additional $149,000 from its general revenues for street and sewer improvements in the terminal area.

Active solicitation of the Missouri dealers to move to Kansas began in June, 1937. As early as August, 1937, Union Pacific contemplated the necessity of giving inducements to dealers, either by making direct payments or by buying from them 'unwanted properties.' In the summer and fall of that year, DeOreo and Fean induced five of the Missouri dealers to serve on a committee for the promotion of the Kansas terminal, agreeing to pay each of them $5000 'in consideration of the services rendered * * * and the occupancy of the food terminal' as tenant. By August, 1938, Union Pacific's employees and agents had negotiated with other dealers with respect to cash payments and other inducements. As opposition developed on the Missouri side, the district court found that the campaign for enlistment of the Missouri dealers became 'open and intense.' Union Pacific, however, was anxious to avoid violating the Elkins Act, and sought the advice of its legal department, which rendered an opinion that payments made by the City to dealers would be lawful. With the assistance of a committee of prominent citizens, the City was persuaded to undertake such payments; in December, 1939, it passed Resolution 11275 authorizing use of the Public Levee Revenue Fund for settlements either with cash or credits on rental, or both, to cover costs incurred by prospective tenants, 'due to rental obligations on present places of business and costs due to abandonment of equipment and facilities *458 now located in, and the good will of said established places of business.' The legality under state law of such payments by the City was promptly established in a test suit at least partially directed by Union Pacific. **1070 State ex rel. Parker v. Kansas City, 151 Kan. 1, 97 P.2d 104 and 151 Kan. 2, 98 P.2d 101.

The City, although now willing to make payments to prospective tenants where necessary, was lacking funds. In arranging for refrigerator service at the market, Union Pacific contracted to buy its entire Kansas City and Omaha ice requirements from the City Ice & Fuel Company. This company leased the market's cold-storage unit for fifteen years at $37,500 per year; Union Pacific now urged the company to pay the City $80,000 as advance rent. The City Ice & Fuel Company did this and also, at Union Pacific's and the City's suggestion, deposited $25,000 with a bank as collateral for proposed unsecured and inadequately secured loans to Missouri produce dealers, although such loans, while offered, were never actually made.

In the negotiations with the Missouri dealers, Union Pacific's representatives took an active part. The district court found that it and the City acted together to induce prospective tenants 'by means of offers, agreements, payments, and gifts to such defendant produce dealers and other produce dealers of free rents, reduced rents, free refrigeration, cash payments and rental credits purporting to be for the purpose of paying such produce dealers' cost of removal from Kansas City, Missouri * * * and the value of furniture and fixtures in their Kansas City, Missouri, places of business and the liability on unexpired leases in Kansas City, Missouri, but in some cases in excess of any such costs, values or liabilities.' The opinion adds that 'The testimony of several dealers with whom negotiations were conducted warrants the conclusion that the primary objective of those *459 who conducted or took part in the negotiations was not the ascertainment of the loss or expense to the dealer of moving, but was the ascertainment of the amount necessary to be paid to bring about the move.' (32 F.Supp. 922.)

John G. Centeno Jr.

July 16th (2021)

(1998)

The record fully supports the trial court's conclusion that the concessions offered were not confined to fair compensation for the costs of removal, as a brief review of the instances specified by the judge will show. Mallin Produce Company, the largest apple concern in the market, claimed $17,300 as its costs of removal, $7,300 for moving its apples, and $10,000 as the 'value of existing lease to be abandoned.' However, Mallin made no claim that he had any obligations under his Missouri lease;[5] he merely said that he had been assured by his landlord that he could continue the lease as long as he lived, and that he would continue to lease the property 'in order to keep a competitor from securing it.' Union Pacific's representative nevertheless offered him $15,000 from the City, and then raised the offer to $20,000 when Mallin agreed to take two units instead of one at the terminal. The O. C. Evans Company, which made no statement of the amount of its Missouri investment, was offered $5,000; when it demanded $10,000, the offer was increased to $7,000. The negotiators increased Cherrito's claim from $900 to $1,450 by raising the cost figures for his Missouri fixtures above the amounts he had specified. Garrett-Holmes & Company, which had claimed only about $20,000 in the summer of 1939 without presenting definite figures, in December demanded an adjustment of $35,000, and accepted $30,500 in cash and one year's free refrigeration. Settlement was reached on a claim for unexpired rentals of $15,000 and cost of irremovable business fixtures, $20,000. Litman Produce Company was given $15,000 in **460** case and advance rent after asserting an obligation to pay six years' rent on an unexpired Missouri lease, when in fact the lease was to expire in a few months and merely contained an option to renew for four years; Litman had not exercised the option, though after the injunction he entered into a new lease with his Missouri lessor. Robinson was allowed to put in a claim for $600 for several unexpired months of an asserted six months' lease, when the tenancy was in fact on a month-to-month basis. Winnick Brothers, a banana firm, was allowed more than $7,000 as the unamortized cost of fixtures and equipment that had apparently cost them less than a thousand dollars.

[5]    Further, Mallin had sublet part of the property, and at the time had a net rental expense of no more than $25 per month.

The proposed cash payments to dealers totalled $111,000, and the proposed credits **1071** on rent more than $30,000. When negotiations with a dealer resulted in a tentative understanding or agreement, he would be told that Union Pacific could not pay him but that the matter would be submitted to the City. The district court's injunction intervened before more than one of the adjustments had been formally agreed to by the City Board and none of these payments had actually been made.

In addition to these circumstances, the standard form lease contained express provisions for free rents and reduced rents. The standard rental adopted was $150 per month per unit, but for the first three months after the official completion date only $50 was charged. Moreover, the terminal opened for business on December 4, 1939; dealers began moving in then and enjoyed rent-free occupation until February 1, 1940, which was announced as the official completion date.

Union Pacific also made available a certain amount of free advertising by interviewing the terminal's tenants on its radio program and allowing them to describe the kind and quality of their produce.

Throughout all phases of these activities, Union Pacific's principal and compelling motive has been to divert produce *461* traffic from other railroads to its own. By tariffs filed with the Interstate Commerce Commission, charges for handling are collected by the Union Pacific for cars originating on or destined to other lines. If the market shifts from Missouri to Kansas, it is estimated that Union Pacific stands to gain traffic revenues of several hundred thousand dollars annually from the development of the market, due largely to the fact that a railroad on whose line a shipper is located enjoys a substantial advantage in soliciting competitive traffic, and comparable losses may be reasonably expected by the railroads now serving the Missouri market.

[2]    [3]    [4]    The Applicable Statutes. The Elkins Act is a part of the federal statutory system for the regulation of interstate carriers of commerce. As with other portions of that system a chief purpose for its enactment was to eliminate rebates, concessions or discriminations from the handling of commerce, to the end that persons and places might carry on their activities on an equal basis. With the adoption of prohibition against open rate cutting, various devices were resorted to.[6] The railroads sought control over competitors to escape rate wars and, despite abhorrence of monopolies even in the utility field, strong in the early years of this century, such concentrations of carrier control were thought to have one advantage at least, the reduction of discriminatory practices.[7] Concealment of the receipt or payment of rebates was made manifest. Strengthening of the enforcement provisions was sought. This effort finally culminated in the legislative authorization of the injunction as

John G. Cortino Jr.

07/16/1898

the simplest and most summary legal instrument to destroy discrimination.[8] The courts have found the statutes effective to accomplish the destruction *462 of discriminatory practices, whatever their form. Violation of the commerce acts through receipt of advantages is to be tested by actual results not by intention.[9] Any and all means to accomplish the prohibited end are banned.[10] We recently said that under competitive conditions existing in the New York area the action of the Commission in attacking discrimination by an order against furnishing non-transportation services below cost to the carrier was valid, although there was no showing that the charges were below fair value.[11] Contribution to a shipper's construction cost is forbidden.[12] In fact favoritism which destroys equality between shippers, however brought about, is not tolerated. Of course, no party to this appeal disputes this broad principle.

6      1897 Annual Report, I.C.C., 47.

7      1900 Annual Report, I.C.C., 13.

8      1902 Annual Report, I.C.C., 8—10; 32 Stat. 848.

9      New York, New Haven R.R. v. I.C.C., 200 U.S. 361, 398, 26 S.Ct. 272, 279, 50 L.Ed. 515.

10     Armour Packing Co. v. United States, 209 U.S. 56, 72, 28 S.Ct. 428, 431, 52 L.Ed. 681.

11     Baltimore & Ohio R. Co. v. United States, 305 U.S. 507, 524, 59 S.Ct. 284, 290, 83 L.Ed. 318.

12     United States v. Union Stock Yard Co., 226 U.S. 286, 33 S.Ct. 83, 57 L.Ed. 226.

**1072 [5] Difficulties in statutory construction arise upon further analysis of the statute. Section 1, quoted in note 1, has a provision making it unlawful for any person to give or receive any concession in respect to transportation. A subsequent clause makes the act of giving or receiving a concession a misdemeanor and punishes its violation by 'every person or corporation, whether carrier or shipper.' Obviously a bonus paid by a railway to induce a prospective shipper to locate along its line would be as much a concession under the statute as a reduction in tariff applicable only to the favored shipper. We are of the opinion that such a payment by a person who is not a carrier, if it is a payment 'in respect to * * * transportation,' would be equally violative of the section in question.

The first prohibition makes it unlawful 'for any person * * * or corporation' to give or receive the concession. *463 The appellants' argument that only carriers or shippers are covered is based on the clause stating the punishment shall be applicable whether the alleged violator is 'carrier or shipper.' Such an argument assumes that the carrier and shipper clause restricts the ordinary meaning of 'any person.' No reason is advanced for such a restriction. As has been set out, there has been a well defined and continuous purpose to eliminate preferences to shippers from our system of transportation for reasons of fairness and to avoid rate wars, detrimental to the efficiency of the carriers. The words stressed by appellants as restrictive were added by the Hepburn Act as an amendment to Section 1 of the Elkins Act to make clear that the earlier phrase 'any person, persons, or corporation' included shippers as well as carriers.[13] In our view, action by any person to bring about discriminations in respect to the transportation of property is rendered unlawful by the Elkins Act. Any other conclusion would do violence to a dominant purpose of carrier legislation.

13     34 Stat. 584, 588, 49 U.S.C.A. s 41; 40 Cong.Rec. 7022.

This conclusion is buttressed by other language in the Elkins Act and by decisions in other courts which have dealt with the question. Section 3 authorizes such suits as this against a carrier and such other persons 'as the court may deem necessary' when a carrier is 'committing any discriminations' and the court may enforce its orders 'as well against the parties interested in the traffic' as against the carrier. For example, in Spencer Kellogg & Sons v. United States, 2 Cir., 20 F.2d 459, a grain elevator owner, without carrier affiliation or cooperation, was convicted for sharing its allowance for elevation service with a shipper.[14]

14     See Interstate Commerce Commission v. Reichmann, C.C., 145 F. 235, 240, rebate by non-carrier private car company to shipper, decided prior to the addition of the clause 'whether carrier or shipper' by the act of June 29, 1906; United States v. Milwaukee

John G. Centeno Jr.

July 16th 2021 9:03

July 1

remain in quarters in the Kansas City Food Terminal.[21] The appellants assign as error the action of the district court in entering any prohibition against payments 'in such amounts as its (the City's) governing body may determine' and 'against use of its Public Levee revenues' for the payment of 'damages sustained by produce dealers moving' to the Terminal.

[21]  This provision reads: '(1) From offering, granting, or giving, or assisting, joining, or cooperating in offering, granting, or giving cash payments or rental credits, free rents, and reduced rents, unsecured or inadequately secured loans constituting concessions, or other valuable considerations to defendant produce dealers or other produce dealers, or produce brokers or other persons, firms, or corporations shipping produce by railroad in interstate commerce to move or for moving to the Kansas City Food Terminal or for leasing space or remaining as tenants in said food terminal.'

Resolution 11275 was construed by the Supreme Court of Kansas to authorize disbursements of available market funds for such purposes 'as in the judgment of said governing body will be to the best interest(s) of (the) city.'[22] By the resolution these expenditures were limited to the dealers' actual costs of removal, including loss of good will.

[22]  State ex rel. Parker v. Kansas City, 151 Kan. 2, 8, 98 P.2d 101, 105.

In prior sections of this opinion, it has been pointed out that any concession by any person or corporation in respect to transportation is forbidden by the federal transportation statutes. The paragraph of the injunction now *470 under examination undertakes to apply this rule so that no cash payments or rental credits may be given. It is clear that in so far as such cash or credit is a 'rebate, concession, or discrimination' such an injunction is proper, but do all payments to induce dealers to rent space in the Terminal fall in these classifications? The trial court said, 'The proposed payments to Missouri dealers to induce them to move to the new market not being made to all tenants at the new market and being in the nature of bonuses the amount of which was not based on actual loss or expense, fall within the classification of discriminations prohibited by the Elkins Act.'

The words of the injunction, however, go farther and forbid payments even though the payments are in all fairness and strictness limited to actual and necessary expenses and losses in moving an establishment. Consequently, in deciding the form of the injunction, we need to determine the breadth of language necessary 'to suppress the unlawful practices' and preclude their revival.[23] The district court summarized in findings of fact and conclusions of law the constant activity of the Union Pacific in pressing forward the idea of the Terminal. It has before it the testimony that the road sought, meticulously, to avoid conflict with the Elkins Act and yet gain the installation of the market; that the railway representatives acted with the City committees and talked with prospective tenants. Railroad influence pervaded each City action and in those circumstances, the decree must be molded to meet the danger of subtle moves against the equality between shippers guaranteed by the Elkins Act.

[23]  Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 461, 60 S.Ct. 618, 627, 84 L.Ed. 852. Cf. N.L.R.B. v. Express Publishing Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930, decided March 3, 1941.

[13]  Where, as here, the action of the City in giving cash and rental credits is, as we have decided, a part of a plan in respect *471 to transportation resulting in an advantage to shippers, we conclude that the giving of any cash, rental credit, free or reduced rents to induce leasing of space in the Terminal is contrary to the Elkins Act. Even if we assume that nothing will be given except the actual costs of removal, the receipt of those costs would put the shipper in a preferred position to all other shippers using the facilities of an interstate carrier who did not receive such concessions. The act condemns any device **1076 'whereby any other advantage (than lower tariffs) is given * * *.' The wording of paragraph (1) is approved.

[14]  Another prohibition of the injunction determines that the rates for space shall be such 'which will yield a proper rate of return upon the full value of the market facilities as a whole, after making provision for all expenses of operation, including maintenance and depreciation.'[24] Identical language in paragraph Third (2) of the injunction *472 forbids produce dealers, of whom many were parties to this proceeding, and their agents from being tenants of the Terminal at rental rates which are not adequate to yield the required amount. The inclusion of this requirement is in our opinion erroneous. The words quoted in the text should be stricken and the injunction amended by inserting in lieu of the stricken words the following: 'which is a fair rental value for the facilities occupied.' The reasons for the deletion follow.

John G. Centeno Jr.

July 16th

1998